## CONNERS *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 44. Argued December 17, 1900.—Decided February 11, 1901.

Where a band belonging to the Cheyenne Indians became dissatisfied with their reservation, separated themselves from the main body of the tribe, started northward to regain their former reservation, were pursued by the troops, were defeated in battle, became hostile and committed depredations upon citizens, it was *held* that neither the Government nor the tribe to which they had originally belonged, were responsible for the value of property taken or destroyed by them.

THIS was also, as in the last case, a claim for live stock taken and destroyed in October, 1878, by certain bands of the Cheyenne and Arapahoe Indians, the suit being against the United States and Dull Knife's and Little Wolf's bands of Northern Cheyennes and the Northern and Southern Cheyennes and Arapahoe Indians. Defendants disclaimed responsibility upon the ground that the depredation was committed by an independent band of Indians, not then in amity with the United States.

The Court of Claims made a finding of facts, the material article of which is set forth in the margin.[1]

---

[1] *Finding of Facts.*

In May, 1877, 937 Northern Cheyennes, men, women and children, were removed from the Red Cloud reservation at Fort Robinson, in Nebraska, to the Southern Cheyenne and Arapahoe reservation at Fort Reno, in the Indian Territory. The Cheyennes went voluntarily, though reluctantly, relying in part upon representations made to them that the southern reservation would be a desirable home, and in part upon what they understood to be assurances that, if dissatisfied with it, they should be brought back. The body of Indians was composed of subdivisions of the Cheyenne tribe known as the bands of Dull Knife, Little Wolf, Wild Hog and Old Crow. These so-called bands had no automony, and had not been recognized either by the Government or by the tribe as separate entities. They were natural segregations of civilized Indians, leading a nomadic life and living in groups in a widely extended habitat. The so-called chiefs were leaders

Upon these findings of fact the court decided as a conclusion of law:

The bands of Dull Knife and Little Wolf, at the time when

---

or spokesmen, commonly called head men. The Indians so removed were about one half of the entire tribe.

On the reservation at Fort Reno, the Cheyennes of Dull Knife's and Little Wolf's bands lived apart from other Indians on the reservation. They were dissatisfied, and made repeated applications to the Government to be brought back to what they termed their native country in the Northwest. No notice being taken of their request, 320 of them broke away from the reservation on September 9, 1878. The commanding officer at Fort Reno sent a military force in pursuit. "The officer in command was particularly instructed if he could induce the Indians to come back without resort to force to do so."

The Cheyennes were overtaken at a point 120 miles distant from Fort Reno. The officer in command summoned them to yield and return to the reservation. Little Wolf, as spokesman for the Cheyennes, replied in substance that they did not wish to make war, but that they would rather die than go back. The troops immediately fired upon the Cheyennes, who returned the fire, and then fled and escaped. They made their way across Kansas and Nebraska, twice fighting United States troops and likewise a body of armed citizens who attacked them. In the northern part of Nebraska they were intercepted by other troops, and after some fighting they surrendered on the 3d of October, and were taken to Fort Robinson. Shortly before this surrender, Little Wolf with about half of the party had separated from Dull Knife, and he and his party were not included in the surrender. Old Crow and Wild Hog, with some of their bands accompanied Dull Knife's party in this escape from the Indian Territory. The leading chief was Dull Knife, and the Indians, regarded as a military force, were under his command. The band at the time of the surrender consisted of 49 men, 51 women and 48 children.

Up to the time these Cheyennes were fired upon in the Indian Territory by the pursuing troops they had committed no atrocity and were in amity with the United States and desired to remain so. After they were fired upon, as before described, their flight was characterized by the usual characteristics of Indian warfare. During the period of this fighting—that is to say, between the 9th of September and the 3d of October, 1878—the Northern Cheyennes, both in the Indian Territory and on the northern reservations, were in amity with the United States.

On these specific facts the court finds the ultimate facts, that at the time when the depredation above set forth was committed the tribe of Northern Cheyenne Indians was in amity with the United States, with the exception of those who composed the bands of Dull Knife and Little Wolf, and that the bands of Dull Knife and Little Wolf were not in amity.

the depredation was committed, were independent bands of Indians within the intent and meaning of the Indian depredation act, 1891; and the tribe of Northern Cheyennes, the defendants herein, was not responsible for their acts of depredation, and the petition should be dismissed. 33 C. Cl. 317.

*Mr. William H. Robeson* for appellant. *Mr. William B. King* was on his brief.

*Mr. Assistant Attorney General Thompson* and *Mr. Kie Oldham* for appellees. *Mr. Lincoln B. Smith* was on *Mr. Thompson's* brief.

MR. JUSTICE BROWN delivered the opinion of the court.

The opinion of the Court of Claims sets forth with more fullness than the findings the details of one of the most melancholy of Indian tragedies—a shocking story of nearly a thousand of the Northern Cheyenne tribe removed from the Red Cloud reservation in Nebraska to the Southern Cheyenne and Arapahoe reservation, at Fort Reno in the Indian Territory; of the profound dissatisfaction of Dull Knife's and Little Wolf's bands, who lived apart from the other Indians on the reservation, and made repeated applications to the Government to be returned to what they termed their native country in the Northwest; of no notice being taken of their request, when over three hundred of them broke away from the reservation; of a military force from Fort Reno sent in pursuit of them with particular instructions to induce the Indians to come back without resort to force, if possible; of their being overtaken one hundred and twenty miles from Fort Reno; of an order to return to the reservation and a reply in substance that they did not wish to make war, but that they would rather die than go back. The troops immediately fired upon them; they returned the fire, fled and escaped; made their way across Kansas and Nebraska, twice fighting the troops as well as a body of armed citizens who attacked them. They were finally intercepted by other troops, and, after some fighting, surrendered on October 3,

1878, and were taken to Fort Robinson, their former reservation in Nebraska. It was two days before the surrender, October 1, 1878, that the property of the claimant is found to have been taken or destroyed by these Indians. Up to the time they were fired upon by the pursuing troops in the Indian Territory, they had committed no atrocity, were in amity with the United States and desired to remain so. After they were fired upon their flight was characterized by the usual excesses of Indian warfare. The leading chief was Dull Knife, who was accompanied by Old Crow and Wild Hog with some of their bands, but, regarded as a military force, they were under the command of Dull Knife. The band at the time of the surrender consisted of forty-nine men, fifty-one women and forty-eight children.

The main body of the Northern Cheyennes, to which these bands seem to have originally belonged, both in the Indian Territory and on the Northern Reservation, were in amity with the United States. Although these bands, under the leadership of Dull Knife, were evidently driven into hostility with the United States by the action of the troops in firing upon them pending a peaceful effort to induce them to return to their reservation, and thereby instituting an Indian warfare, the fact still remains that this was an independent band which had broken away from the main body of the Cheyennes, and was acting in hostility to the United States and to all the frontiersmen along their path of retreat. As stated in the opinion of the court: "They fought and fled, and scattered and reunited; they fought other military commands and citizens who had organized to oppose them, and in like manner they again and again eluded their opponents, making their way northward over innumerable hindrances. They had not sought war, but from the moment when they were fired upon they were upon the war path. —men were killed; women were ravished, houses were burned, crops destroyed. The country through which they fled and fought was desolated, and they left behind them the usual well known trail of fire and blood."

While the facts of this case, which are set forth with much greater detail in the opinion of the Court of Claims, appeal strongly to the generosity of Congress to recompense those who

have suffered by the inconsiderate and hasty action of the troops in driving these Indians into hostility, they afford no ground whatever for a judgment against the tribes to which these Indians originally belonged, but from which they had separated and carried on independent operations. In fact, it would be highly unjust to add to their manifest sufferings the payment of these damages from their annuities, or from other funds standing to their credit. Nor does the claim make a case against the United States under the act vesting jurisdiction in the Court of Claims. We are not at liberty to consider the circumstances under which these Indians were driven into hostility to the United States. That the band was not in amity from the moment it was fired upon by the troops is entirely clear. That the band itself was beyond the control of the tribes to which it originally belonged is equally clear. As stated by the court below, "It was not the case of individual Indians wandering from the main body, murdering and destroying, while the main body remained in amity with the United States; but it was the case of an entire body waging armed resistance, with all its might and with all the ferocity of Indian warfare, against whatever power the United States could bring to bear upon them. The fearful extermination of Dull Knife's band by the responsible military authorities of the United States on the assumption that they were escaping prisoners of war, refutes the idea of preëxisting amity and renders it preposterous." The fact that they were treated as prisoners of war also refutes the idea that they were murderers, brigands or other common criminals.

To constitute a "band" we do not think it necessary that the Indians composing it be a separate political entity, recognized as such, inhabiting a particular territory, and with whom treaties had been or might be made. These peculiarities would rather give them the character of tribes. The word "band" implies an inferior and less permanent organization, though it must be of sufficient strength to be capable of initiating hostile proceedings.

The opinions of the court below in both of these cases are so thorough and satisfactory that a prolongation of this opinion

would be but a mere repetition of· those. The law which con-
trolled the disposition of the case just decided is equally appli-
cable here, and the judgment of the Court of Claims dismissing
the petition is therefore

·*Affirmed.*